UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| MV3 PARTNERS LLC,<br><br>        Plaintiff,<br>v.<br><br>ROKU, INC.<br><br>        Defendant. | Civil Action No.: 6:18-cv-00308-ADA<br><br>**JURY TRIAL DEMANDED** |

**ROKU, INC.'S MEMORADUM IN SUPPORT OF
ITS RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

Pursuant to Fed. R. Civ. P. 50, Defendant Roku, Inc. (Roku) moves the Court for judgment as a matter of law of no infringement, and consequently no damages, against Plaintiff MV3 Partners LLC (MV3) on the sole count of the Amended Complaint (D.I. 5). Based upon the scant evidence presented by MV3 in its case-in-chief and the overwhelming and unrebutted of evidence of non-infringement, no reasonable jury would have a legally sufficient evidentiary basis to find that Roku infringed.

As stated in Roku's original motion for judgment as a matter of law, MV3's case-in-chief depends upon emotional appeals and obfuscation rather than an evidentiary basis. In contrast, Roku's case-in-chief has been painstakingly built on a bedrock of solid evidence.

## I.   Legal Standard

Federal Rule of Civil Procedure 50(a) (1) provides:

> If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may: (A) resolve the issue against the party; and (B) grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

"Under Rule 50, a court should render judgment as a matter of 'law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue'" *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 149 (U.S. 2000) (citing Fed. R. Civ. P. 50(a)); *Palasota v. Haggar Clothing, Co.,* 499 F.3d 474, 480 (5th Cir. 2007). To decide a motion for judgment as a matter of law, the record must be reviewed for the presence of substantial evidence and for legal error. See *Motorola, Inc. v. Interdigital Technology Corp.,* 121 F.3d 1461 (Fed. Cir. 1997). The substantial evidence standard requires more than a mere scintilla of evidence. *Biodex Corp. v. Loredan Biomedical, Inc.,* 946 F.2d 850 (Fed. Cir. 1991). If a court erroneously submits an issue to the jury on which there is neither evidence nor argument,

it is obligated to grant a motion for judgment as a matter of law on that issue. *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, Inc., 873 F.2d 1422, 1426 (Fed. Cir. 1989).

With respect to infringement, it is MV3's burden to establish infringement. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). To establish infringement MV3 must meet its burden of proof by a preponderance of the evidence, on a claim-by-claim basis, of showing that each and every limitation of each asserted claim is present in each accused product. *Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002). Likewise, MV3 has the burden of establishing damages by a preponderance of the evidence. *Standard Havens Prods., Inc. v. Gencor Indus., Inc*. 953 F.2d 1360 (Fed. Cir. 1991).

## II.   ANALYSIS

### A.   No Reasonable Jury Could Find Infringement

MV3 has not carried its burden of proving that Roku infringed the '223 patent. MV3's case-in-chief failed to establish a legally sufficient evidentiary basis for any reasonable jury to find that Roku infringed the '223 patent. There is not a sufficient evidentiary basis to establish direct infringement, either literally or under the doctrine of equivalents, or indirect infringement.

Roku has presented concrete, credible evidence that the accused Roku devices do not infringe the '223 patent.

In contrast, MV3's fact witnesses presented no substantive factual support for its positions. Their testimony largely lacked any substance and was composed of an emotional appeal to the jury that the three founders of MV3, a non-practicing entity, were pioneering innovators, family men, and philanthropists who were pitted against a large and powerful company who wrongly refused to take a license. *See* 10/05/2020 Trial Transcript, *passim*. The fact witnesses consistently referred to the patent abstract as evidence of their invention (*e.g.,*

Trial Transcript at 30:20-31:3) and described their invention in generalities to create the impression that they had invented media streaming generally when their claimed invention is very narrow and limited by the claims to a very specific form of screen mirroring and casting. *See, e.g.*, 10/05/2020 Trial Transcript at 7:13 – 8:2 (providing description of the invention at a "high level"). This attempt to redirect the jury from focusing on the patent claims to the patent abstract is in direct contradiction of the governing law of patent infringement.

MV3's technical expert fared no better. The technical expert, Dr. Schonfeld presented argument, without sufficient evidentiary basis that infringement existed and sought to obfuscate the difference between the patent claim and its individual elements.

He disingenuously re-characterized the patent from a "mobile set top box" to a "mobile video" patent. In effect, Dr. Schonfeld and the inventor seek to read several claim limitations out of the patent claims.

Dr. Schonfeld failed to establish an evidentiary basis for the existence of multiple elements of each of the asserted claims of the '223 patent as follows. Specifically, MV3 failed to offer a sufficient evidentiary basis for at least each of the following elements of the Asserted Claims 1, 15, 21, 23, 30, 32, and/or 53; whereas, Roku's witnesses provided strong evidence of non-infringement, as discussed below:

- **"a docking port configured to accept a mobile computing device that has a native resolution of a first size format and receives media content from at least two different types of communications networks"**

  **MV3's Evidence**

    o Dr. Schonfeld and MV3 seek to read out the "hardware" aspect out of the Court's "plain and ordinary meaning" construction of "docking port" which under the Court's construction, includes a "hardware" or "software *and* hardware"

requirement, as agreed by the parties. 10/07/2020 Trial Transcript (Morning) at 109:17- 110:1 (testimony of Dr. Schonfeld). Despite that construction and its prior agreement, MV3 and its expert now seeks to eliminate the "hardware" requirement in contradiction of the Court's order. *See, e.g.* 10/05/2020 at Trial Transcript (Afternoon) at 38:6-9 (principal of MV3 testifying that docking port not even required to infringe); 10/07/2020 Trial Transcript (Morning) at 109:17-113:4 (identifying the implementation of a wireless communication standard 802.11, implemented by software as a docking port without identification of corresponding hardware).

**Roku's Evidence**

o   Roku explained to the Jury that its use of a wireless WiFi interface does not meet the plain and ordinary meaning of docking port to those of ordinary skill in the art. 10/09/2020 Trial Transcript (Morning) at 99:22 – 100:11. Not only has Dr. Russ designed numerous set top boxes that were sold to millions of consumers, but he also worked with and supervised those of ordinary skill in the art during this time, and explained to the Jury that persons of ordinary skill in the art would never consider a docking port to be a wireless WiFi interface, which is entirely consistent with numerous exemplary docking ports existing at the time of the '223 patent, including cordless phones with docking ports, clock-radios with docking ports, computers with docking ports, and TV's with docking ports. 10/09/2020 Trial Transcript (Morning) at 91:7-12, 94:2-20. Dr. Russ's testimony is also consistent with the testimony of Roku's witnesses, which explained that none of Roku's products have a docking port. 10/08/2020 Trial Transcript (Afternoon) at

4

86:8-15, 136:13-19, 139:23 – 140:1.

- **"a television signal input that receives at least one type of television signal"**

    **MV3's Evidence**

    o  Dr. Schonfeld offered a conclusory opinion without evidentiary support that a television signal was the same as watching (*i.e.* streaming over the Internet) a TV show streamed over the internet. *See, e.g.*, 10/07/2020 Trial Transcript (Morning) at 115:19 -117:18 (while admitting that specific examples of the patent refers to traditional TV signals offering the opinion without factual support that a "TV signal" in the context of the '223 patent could include streaming a TV show over the internet).

    **Roku's Evidence**

    o  Live TV streamed over the Internet is not a television signal, but just a unicast transmission of IP packets streamed to recipients, just like any other transmission of data over the Internet. 10/09/2020 Trial Transcript (Morning) at 69:17 – 73:3. Dr. Russ offered his opinion that TV signals are a specific type of signal, such as what would be used by a Cable Set Top Box or a TV with an antenna, and that Roku players are not built to receive TV signals, only Wi-Fi signals. 10/09/2020 Trial Transcript (Morning) at 137:13 – 147:20. Dr. Russ also explained that Dr. Schonfeld's opinion confuses TV content with TV signals, and the claims of the patent are directed to TV signals, not simply TV content. 10/09/2020 Trial Transcript (Morning) at 147:21 – 149:17.

- "a video processor configured to receive and process the media content from the mobile device input, the video processor including adaptive circuitry to process the media content transmitted from unicast and multicast broadcasts, and the video processor including circuitry and instructions operable to process a predefined protocol stack of video packets forming at least a portion of the media content"

    **MV3's Evidence**

    o  The claims of the '223 patent expressly require that the video processor recited in the claims be configured to process media content transmitted from unicast *and* multicast broadcast. Dr. Schonfeld offered no evidence that Roku devices or TVs can receive multicast broadcasts and offered only a conclusory opinion that this claim element was met. 10/07/2020 Trial Transcript (Morning) at 117:19 -123:2.

    **Roku's Evidence**

    o  Roku's witnesses, on the other hand, consistently explained that the accused Roku products cannot process media content transmitted from multicast broadcasts, as Roku Players and Roku TVs do not have software in them to process multicast broadcasts packets. 10/09/2020 Trial Transcript (Morning) at 131:4-10. Similarly, Roku's Senior Vice President of Product Engineering and Operations explained to the Jury that not only does Roku not support media content transmitted from multicast broadcasts, but that companies have previously approached Roku to add such functionality into its products, but Roku declined to do so and lost sales because of it. 10/08/2020 Trial Transcript (Afternoon) at 83:17 – 84:22.

- "receiving the first media content in the first size format from the mobile device input"

    **MV3's Evidence**

    o Dr. Schonfeld offered only a conclusory opinion without factual support that this element was met. 10/07/2020 Trial Transcript (Morning) at 126:24-128:6.

    **Roku's Evidence**

    o As to DIAL, Dr. Russ testified that this operation is a form of direct Internet streaming to a Roku Player or Roku TV without sending content through a mobile computing device as an intermediary conduit, which is entirely antithetical to the '223 patent and its claims, thereby precluding application of the doctrine of equivalents.  10/09/2020 Trial Transcript (afternoon) at 181:11 – 187:5.

- "querying the mobile computing device to determine the first size format;"

    **MV3's Evidence**

    o Dr. Schonfeld offered, without factual support, the incomprehensible opinion that the communications between a mobile phone and a Roku player can be either a response or request: "even though it's a response, it's actually a request." 10/07/2020 Trial Transcript (Morning) at 128:7-130:16.  This opinion creates at least some ambiguity whether the limitation is met or further effectively vitiates the requirement that the *mobile computing device* be queried and opines that querying the Roku device is essentially the same as querying the mobile computing device.

    **Roku's Evidence**

    o As to DIAL, Dr. Russ testified that this operation is a form of direct Internet streaming to a Roku Player or Roku TV without sending content through a mobile

7

computing device as an intermediary conduit, which is entirely antithetical to the '223 patent and its claims, thereby precluding application of the doctrine of equivalents. 10/09/2020 Trial Transcript (afternoon) at 172:3 – 181:9.

- **"querying the display device, determining the native display resolution of the second size format of the display device based on a response resulting from the query of the display device"**

    **MV3's Evidence**

    o For Roku TVs, despite not having separate display device, Dr. Schonfeld offers a conclusory opinion without specifically addressing the lack of a query of a separate display device for Roku TVs that this limitation was met. 10/07/2020 Trial Transcript (Morning) at 130:17-133:11. Since there is no query of a separate display device in Roku TVs, this limitation can only be met by relying upon the doctrine of equivalents. Dr. Schonfeld, however, was precluded from arguing that this limitation was met for DIAL casting under the doctrine of equivalents, but his testimony purposely did not make that clear, leaving ambiguity to permit the jury to apply the doctrine of equivalents to this limitation to DIAL casting (*e.g.* D.I. 332 at 8 (granting Roku's Motion to preclude MV3 and Dr. Dan Schonfeld from relying on the doctrine of equivalents for the "querying the display device" limitation).

    **Roku's Evidence**

    o There is no question of fact left for the jury to decide on this issue. Dr. Russ testified that the LCD panel of a TV is not a display device; that the LCD panels in Roku TVs are not queried for their resolution because the panel is unable to respond to a query (instead the panel's resolution is simply part of the TV's

8

memory); and finally, Dr. Russ explained to the jury that the resolution source code that Dr. Schonfeld relied upon to support his opinion that Roku TV's query their display panels is not actually part of the code that is used by the TVs. 10/09/2020 Trial Transcript (afternoon) at 158:18 – 165:25.

- **"authenticating the validity of a user associated with the mobile computing device"**

    **MV3's Evidence**

    o  Dr. Schonfeld testified that authenticating the validity of the *device* equates to authenticating the validity of the *user*. *See* 10/07/2020 Trial Transcript (Afternoon) at 9:1-12:20. Dr. Schonfeld also admitted that the '223 patent's claims say authenticating the user, not the device, and when multiple user's use a mobile computing device, the accused Roku product's device authentication do not authenticate the validity of a user associated with the mobile computing device. 10/07/2020 Trial Transcript (Afternoon) at 117:18 – 120:1. In the case of DIAL, Dr. Schonfeld admitted that he doesn't know what's being done on Netflix servers and, therefore, has no evidence of what entity – Roku or Netflix – would control any sort of user log-in information. 10/07/2020 Trial Transcript (Afternoon) at 122:13 – 123:4.

    **Roku's Evidence**

    o  Dr. Russ explained to the Jury the important distinctions between device authentication and user authentication, which were ignored by Dr. Schonfeld, and then explained to the jury that the screen mirroring source code relied upon by Dr. Schonfeld is unquestionably based upon device authentication and not user authentication. 10/09/2020 Trial Transcript (Morning) at 108:9 – 114:1. In the

case of DIAL, Dr. Russ explained that because Netflix has 180,000,000 accounts, as a matter of common sense and the need for sufficient computing resources, Netflix must control its user log-in process, not Roku.  10/09/2020 Trial Transcript (Morning) at 114:17 – 117:5.

- **"determining, based on the validity of the user, that the received first media content is permitted to be provided to the display device"**

    <u>MV3's Evidence</u>

    o   Again, Dr. Schonfeld testified that authenticating the validity of the *device* equates to authenticating the validity of the *user*.  See 10/07/2020 Trial Transcript (Afternoon) at 12:21-13:23.

    <u>Roku's Evidence</u>

    o   As a matter of law, Dr. Schonfeld's analysis is inadequate because the '223 patent requires separate "authenticating" and "determining" steps.  Dr. Russ explained to the Jury that in the case of screen mirroring, there is only ever a single device authentication step, not a first user authentication step and then a subsequent determination step, and that in the case of DIAL, the user log-in process is controlled by Netflix, for example.  10/09/2020 Trial Transcript (Morning) at 120:7 – 125:11.

As shown above, only credible, consistent evidence on the record has been offered by Roku and supports a finding of non-infringement.  For at least these reasons, judgment as a matter of law is warranted with respect to all MV3's sole count of infringement (direct and indirect) with respect to Asserted Claims 1, 15, 21, 23, 30, 32 and 53.  Likewise, MV3 offered no evidence upon which a reasonable jury could rely that Roku was aware of the patent prior to being sued or encouraged anyone, let alone the Roku TV manufacturers, to infringe the '223

patent. Since judgment as a matter of law of non-infringement is warranted, judgement as a matter of law of no damages is also appropriate.

### B. Damages

MV3 seeks an award for damages for the alleged infringement of the '223 patent in the form of a reasonable royalty based on the survey approach set forth by its expert, Mr. Roy Weinstein. 10/08/2020 Trial Transcript, Testimony of Mr. Roy Weinstein.

In his approach, Mr. Weinstein used results from a survey conducted by Dr. Marais that estimated that 10.5% of Roku product purchasers would not have purchased their device at the price they paid if the ability to perform screen mirroring and casting was not available. Mr. Weinstein applied this 10.5% figure to Roku's U.S. sales of accused products to determine at-risk unit sales and at-risk revenues over the calculated time period. By applying an average gross profit margin to these values, Mr. Weinstein arrived at an at-risk profit value during this period.

Roku moves for judgment as a matter of law on damages because MV3's requested damages with respect to the survey are not supported by the evidence and the evidence presented by MV3 is so flawed that a reasonable jury could not find for MV3 on damages based on the survey approach.

In short, MV3 failed to elicit requisite evidence to support its reasonable royalty because:

- the survey is fundamentally flawed by including Play on Roku casting, a non-accused feature, lumped together with the accused screen mirroring and DIAL casting features;
- the survey is unreliable based on numerous additional flaws and biases as well as flawed assumptions in Mr. Weinstein's analysis; and

11

- Mr. Weinstein's attempt to "apportion" out the Play on Roku results from his ultimate royalty rate based on usage data is not based on any scientifically valid methodology and relies on flawed assumptions.

10/13/2020 Trial Testimony of Ms. O'Laughlin and Ms. Kindler.  First, the explicit description of the survey details that (1) screen mirroring; (2) casting from Netflix, YouTube, or Hulu (i.e., DIAL); and (3) casting personal content (i.e., Play on Roku) are the features to be considered by the respondents.  This is not disputed by the parties.  (*E.g.*, October 6 Hearing Tr. at 3:19-4:5 (MV3 counsel explaining that the survey received results about the importance of these three features).)  But, after the survey was completed, MV3 decided to no longer accuse casting personal content (*i.e.*, Play on Roku).  With this flaw, it is impossible to appropriately isolate the effect of the accused features on consumer purchase decisions and attempting to correct for this error after the fact is simply not possible.  And, including this non-accused feature leads to inflated results that are not relevant to the case.  10/13/2020 Trial Testimony of Ms. O'Laughlin.

Surveys that include non-accused features are often excluded, supporting Roku's assertion that it would not be reasonable for a jury to rely on this approach for damages.  *See, e.g., Fractus, S.A. v. Samsung*, No. 6:09-cv-203, 2011 U.S. Dist. LEXIS 154697, at *13 (E.D. Tex. Apr. 29, 2011) (excluding survey evidence related to the "value of internal antennas not tied directly to Plaintiff's technology" because it "confuses the issues and must be excluded"); *Unwired Planet, LLC v. Apple Inc.,* No. 13-cv-04134, 2017 U.S. Dist. LEXIS 20928, at *4 (N.D. Cal. Feb. 14, 2017); *Parallel Networks Licensing, LLC v. Microsoft Corp.*, 777 Fed. Appx. 489, 492-93 (Fed. Cir. 2019) (nonprecedential) (affirming the district court's excluding the survey because the survey failed to distinguish between infringing and non-infringing uses and overstated the percentage of customers involved in direct infringement).

The survey also includes additional problems with respect to leading questions and biases. For example, the screening questions immediately allowed respondents to guess that the survey wanted Roku purchasers, inviting yea-saying bias and demand artifacts (*i.e.*, respondents doing what they believe is desired) and achieving an inflated share of respondents indicating that they are Roku purchases. 10/13/2020 Trial Testimony of Ms. O'Laughlin. And, the survey strongly emphasized casting and mirroring out of context of other, more well-known and fundamental Roku functionalities, thereby artificially inflating the importance of these features in the respondents' minds. 10/13/2020 Trial Testimony of Ms. O'Laughlin.

Mr. Weinstein's reliance on the survey is also premised on false assumptions. For example, Mr. Weinstein assumes that all the people who indicated they would not have paid the price they paid if the ability to perform screen mirroring and casting was not available. But, the survey goes on to show that numerous people would have purchased the device at various discount levels, information that Mr. Weinstein ignored. Thus, the 10.5% does not account for people who would have simply waited for a discount. Similarly, Mr. Weinstein ignores that 25% of Rokus are given as gifts, and thus the purchaser may not ultimately care about the accused screen mirroring and DIAL casting features. 10/13/2020 Trial Testimony of Ms. O'Laughlin and Ms. Kindler.

Finally, nothing in the evidence proves that usage data from a non-accused feature can be used to correct purchasing data with respect to a lumped group of accused and non-accused features. Mr. Weinstein failed to provide any support for why a share of streaming hours can be used to correct the survey to accurately represent only the two accused features, without Play on Roku. Using usage data to correct damages calculations based on purchase decisions is beyond comparing apples to oranges. Usage data cannot be correlated with a reason to purchase even if

13

it was the same feature and the same person, never mind with three blended features and different, anonymous people, as is the case here.  10/13/2020 Trial Testimony of Ms. O'Laughlin and Ms. Kindler.

Because the survey did not test the value of the accused functionality and is replete with biases and leading questions, and because the value associated with the accused functionality cannot be obtained after the fact by baseless calculations based on usage data, Roku is entitled to JMOL that reasonable jurors could not find for MV3 on damages based on this survey approach.

If damages are warranted, MV3 has failed to establish a legally sufficient evidentiary basis for any reasonable jury to find that damages should be awarded.  There is not a sufficient evidentiary basis to establish entitlement to damages under any theory of infringement.

### III. CONCLUSION

For the reasons set forth herein, Roku respectfully requests that the Court enter judgment as a matter of law in its favor with respect to the sole count of direct infringement, either literal or under the doctrine of equivalents, and indirect infringement as set forth in the Complaint and further to find that damages should not be awarded in light of the Court's judgment of no infringement.

Respectfully submitted,

/s/ Alexander J. Hadjis

Alexander J. Hadjis (*pro hac vice*)
Lisa M. Mandrusiak (*pro hac vice*)
Frank J. West (*pro hac vice*)
Christopher Ricciuti (*pro hac vice*)
OBLON, MCCLELLAND, MAIER
& NEUSTADT, L.L.P.,
1940 Duke Street
Alexandria, VA 22314
(703) 413-3000
ahadjis@oblon.com
lmandrusiak@oblon.com
fwest@oblon.com
cricciuti@oblon.com

Richard D. Milvenan
State Bar No. 14171800
McGINNIS LOCHRIDGE LLP
600 Congress Avenue, Suite 2100
Austin, Texas 78701
(512) 495-6000
rmilvenan@mcginnislaw.com

David N. Deaconson
State Bar No. 05673400
Pakis, Giotes, Page & Burleson, P.C.
400 Austin Avenue
Waco, TX 76701

Darryl Adams
Texas Bar No. 00796101

        SLAYDEN GRUBERT BEARD LLC
        401 Congress Ave., Ste. 1650
        Austin, Texas 78701
        dadams@sgbfirm.com

        ATTORNEYS FOR
        DEFENDANT ROKU, INC.

## **CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing document was served on all counsel of record via electronic transmission on October 13, 2020.

/s/ Lisa M. Mandrusiak