**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **MV3 PARTNERS LLC,** | § | |
| | § | **Civil Action No.: 6:18-cv-308-ADA** |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **JURY TRIAL DEMANDED** |
| | § | |
| **ROKU, INC.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**PLAINTIFF MV3 PARTNERS LLC'S MOTION FOR NEW TRIAL**

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ............................................................................................... 1

II.   FACTUAL BACKGROUND .............................................................................. 3

      A.   Roku Repeatedly Argued And Elicited Testimony In Support Of Rejected
           Claim Constructions. ............................................................................... 3

           1.   Roku Repeatedly Argued Improperly That The Term "Docking
                Port" Requires A Physical Connection. ......................................... 3

                a)   Roku Defied The Court's Claim Construction Order. ............ 3

                b)   The Court Did Not Include The Agreed Construction Of
                     Docking Port In Its Jury Charge And Its Subsequent Reading
                     Of The Claim Construction Order To The Jury Did Not Cure
                     The Error. ................................................................... 7

           2.   Roku Misled The Jury By Restricting The Construction of
                "Television Signal" And Insisting A Mobile Set Top Box Required
                A TV Tuner Despite The Fact The Court Rejected This Proposed
                Construction. ............................................................... 8

           3.   Roku Impermissibly Imported A Requirement To Receive A
                Television Signal Through A TV Tuner Into "Mobile Set Top
                Box". ................................................................................. 9

      B.   Roku's Non-Practicing Entity Insinuations Were Prejudicial And The
           Curative Instruction Was Insufficient. ..................................................... 10

      C.   Roku's Damages Expert Relied Upon Two Roku License Agreements In
           Her *Georgia-Pacific* Analysis Although She And Dr. Bovik Testified They
           Were Not Technologically Comparable ..................................................... 12

III.  ARGUMENT .................................................................................................... 14

      A.   Legal Standard ........................................................................................ 14

      B.   A New Trial Should Be Granted Because The Jury Was Improperly
           Required To Resolve Claim Construction Disputes ..................................... 15

           1.   Roku's Repeated Violations Of The Court's Orders Were
                Prejudicial ...................................................................... 15

           2.   It Was Prejudicial Error To Allow The Jury, Rather Than The Court,
                To Construe Disputed Terms ................................................. 17

      C.   A New Trial Should Be Granted Because There Were Prejudicial Errors In
           The Jury Instructions And The Introduction Of Evidence. ......................... 19

IV.   CONCLUSION ................................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aero International, Inc. v. United States Fire Ins. Co.*,
713 F.2d 1106 (5th Cir. 1983) ...............................................................19

*Amway Corp. v. BHIP Global, Inc.*,
No. 4:10-CV-549, 2013 U.S. Dist. LEXIS 75393 (E.D. Tex. May 29, 2013)....................2, 17

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970)...............................................................12, 13

*Hartsell v. Dr. Pepper Bottling Co.*,
207 F.3d 269 (5th Cir. 2000) ...............................................................19

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
822 F.3d 1312 (Fed. Cir. 2016)...............................................................18

*Jordan v. Maxfield & Oberton Holdings, L.L.C.*,
No. 19-60364, 2020 U.S. App. LEXIS 31893 (5th Cir. Oct. 7, 2020) ..............15, 20

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc.*,
554 F.3d 1010 (Fed. Cir. 2009)...............................................................18

*Montgomery Ward & Co. v. Duncan*,
311 U.S. 243 (1940)...............................................................2, 15

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)...............................................................15, 18, 19

*Sibley v. Lemaire*,
184 F.3d 481 (5th Cir. 1999) ...............................................................20

*Smith v. Transworld Drilling Co.*,
773 F.2d 610 (5th Cir. 1985) ...............................................................2, 15

*Straub v. Reading Co.*,
220 F.2d 177, 181 (3d Cir. 1955)...............................................................17

*Versata Software Inc. v. SAP Am., Inc.*,
No. 2:07-CV-153 CE, 2011 U.S. Dist. LEXIS 102339 (E.D. Tex. Sept. 9,
2011) ...............................................................14

*Waddington North America, Inc. v. Sabert Corporation*,
Case No. 2-09-cv-04883 GEB, 2011 WL 3444150 (D.N.J. Aug. 5, 2011)  ........................1, 17

**Statutes**

35 U.S.C. § 282 .................................................................................................................14

**Other Authorities**

Federal Rule of Civil Procedure 59 ......................................................................... *passim*

Plaintiff MV3 Partners LLC ("MV3") respectfully moves the Court for a new trial pursuant to Federal Rule of Civil Procedure 59.  In support of its motion, MV3 shows the Court as follows:

## I.     INTRODUCTION

Under difficult circumstances, the Court went to extraordinary lengths to hold a safe and fair trial.  But, Roku, rather than abiding by this Court's orders to ensure a fair adjudication of MV3's patent property rights, created a "trial by ambush."  Roku's constant and brazen misconduct during the trial – misconduct which dated back even before trial to its dissembling on its motion to transfer – ended up tainting the jury and resulted in an unfair trial.

Roku's repeated flouting of this Court's claim construction and other orders—orders which MV3 relied upon to prepare its case— was the basis for the jury's verdict finding U.S. Patent No. 8,863,223 (the "'223 Patent") was not infringed.  (Dkt. 387.)  During the trial, Roku's counsel and witnesses repeatedly disregarded the Court's Claim Construction Order ("CCO") and its Order on MV3's *Daubert* motions and motions *in limine* ("MIL") in a manner which introduced improper testimony, confused the jury and caused substantial prejudice to MV3.  (Dkts. 90, 332.)  Roku also presented non-infringement theories that either had never been disclosed or had been precluded by the Court's grant of MV3's MIL 4.  (Dkt. 332 at 4-5.)  Among Roku's other misconduct compounding the prejudice leading to the jury's finding non-infringement, were its insinuations that MV3 is a grasping non-practicing entity ("NPE") not entitled to damages – insinuations which violated the Court's ruling on MIL 1(i) and were based on comparisons of the damages MV3 sought to two Roku license agreements its witnesses admitted were not comparable.  It was prejudicial for Roku to force MV3 to continually have to object to Roku's repeated violations of the Court's Orders, creating the impression that MV3 was being disruptive and attempting to hide something. *Waddington North America, Inc. v. Sabert Corporation*, Case No. 2-09-cv-04883 GEB, 2011 WL 3444150, at *5 (D.N.J. Aug. 5, 2011) (There, the court ordered a new trial where "constant

misconduct put[] opposing counsel in lose-lose situation requiring counsel to either object and be seen as combative, or allow the misconduct to continue . . . . [giving] the jury the impression that counsel for [plaintiff] was angry, combative, and attempting to keep relevant evidence from it.") As the Court itself noted, "I understand when a lawyer is asking the questions, it's very difficult [to object] – that's why we have motions *in limine*." (Declaration of Jonathan Waldrop, dated October 23, 2020 ("Waldrop Decl."), Ex. 3 at 129:10-12.)   The Court nevertheless allowed Roku's misconduct to continue and did not prevent further violations of its omnibus MIL and *Daubert* Order.

A motion for new trial may be "bottomed on the claim that . . . the trial was not fair to the party moving; and may raise . . . alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *see also Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985) (Rule 59 "confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict. . . . A new trial may be granted, for example, if . . . the trial was unfair, or prejudicial error was committed in its course.").   "When determining whether a new trial should be granted based on violation of court orders, the trial court is given great deference to 'gauge the prejudicial impact' of a party's or their counsel's improper conduct during the trial.   A new trial is warranted on the ground of misconduct during the trial where the misconduct establishes the belief that the jury was influenced by 'prejudice in reaching its verdict.'" *Amway Corp. v. BHIP Global, Inc.*, No. 4:10-CV-549, 2013 U.S. Dist. LEXIS 75393, at *7-10 (E.D. Tex. May 29, 2013) (*quoting All Freight Systems v. James*, 115 F. App'x 182, 187 (5th Cir. 2004).)   A new trial here is plainly warranted.

## II.     FACTUAL BACKGROUND

### A.     Roku Repeatedly Argued And Elicited Testimony In Support Of Rejected Claim Constructions.

Throughout this case Roku has reargued claim constructions rejected by the Court.  For example, when addressing MV3's *Daubert* motion on the term "adaptive circuitry," the Court noted that it had rejected Roku's proposed construction and that Roku's expert, Dr. Bovik (and Dr. Russ, who relied upon Dr. Bovik's definition), had reiterated the already rejected construction, claiming that it was plain and ordinary meaning.  (Waldrop Decl., Ex. 1 at 74:3-76:17) ("I will tell you it struck the Court that the use of all the claim terms that the plaintiff has been unhappy with, this was the one that most struck the Court as not okay because it was proffered, and we said, that's not what we're going to use, and then you had Dr. Bovik say, this is my thinking of what plain and ordinary meaning is.")  The Court made clear it was patently improper for Roku's expert to attempt to circumvent the Court's construction by asserting that Roku's rejected construction is the "plain and ordinary" meaning.

That Roku's conduct was utterly improper was made even more crystal clear by the granting of MV3's MIL 4(vii) to exclude Roku's testimony or arguments contrary to, or unsupported by, the Court's CCO, (Dkt. 332 at 5), and the grant of MV3's *Daubert* motion excluding the opinions in Dr. Russ's rebuttal expert report regarding certain issues relating to the terms "Set Top Box," "Docking Port," "Multicast," and "Adaptive Circuitry."  (Dkt. 332 at 7.)  Roku repeatedly and blatantly ignored and violated these Orders throughout the trial.

### 1.     Roku Repeatedly Argued Improperly That The Term "Docking Port" Requires A Physical Connection.

#### a)     Roku Defied The Court's Claim Construction Order.

During claim construction, Roku argued that the term "docking port" should be construed to mean a "physical interface into or on which another component may be placed."  (Dkt. 72 at 8.)  It

argued that "[w]hether a 'docking port' is a physical interface or it is hardware and/or software for electrical connection will need to be understood by the factfinder to make findings." (*Id*. at 12.)  By contrast, MV3 proposed the construction "hardware and/or software that enables a wired or wireless connection." (*Id*. at 8.)

During the *Markman* hearing, the Court expressed concern over Roku's proposed construction, stating "and so the defendant understands, I was uncomfortable in terms of your construction reading docking port to require it to be a physical interface into or on which another component may be placed.  I thought that went too far." (Waldrop Decl., Ex. 2 at 57:4-12.)  In its CCO, the Court adopted the plain and ordinary meaning of the term "docking port," with the understanding that this included the parties' agreement that a "docking port" consisted of "either (1) hardware *or* (2) hardware and software." (Dkt. 90 at 6, fn. 1 (emphasis added); *see also* fn. 2.)  The Court also granted MV3's *Daubert* motion precluding Dr. Russ from opining "that a docking port requires a docking station." (Dkt. 332 at 7.)

Yet, despite the Court's CCO, the Court's Order on MIL 4(vii), and the Court's *Daubert* Order, Roku at trial impermissibly and repeatedly advanced the argument that a "docking port" required a physical interface.  For example, in opening statements Roku's counsel argued that the '223 Patent claims "a docking port that ***accepts*** a mobile computing device . . . . Roku's products have no such thing. . . . There is ***no physical connector*** for such a mobile device on a Roku product." (Waldrop Decl., Ex. 3 at 81:3-20 (emphasis added).)  Similarly, during his direct examination, Roku's expert Dr. Russ, was allowed to testify, over MV3's objection, that "docking port" required a physical connection despite the CCO's rejection of the requirement and the parties' agreement that it could also consist of "hardware and software," which would allow a wireless rather than a physical connection.  Dr. Russ testified:

4

Q:  All right.  Is there anything on or about that device that would comport with a docking port?

A:  I don't believe there's anything here that meets the plain and ordinary meaning of docking port.

Q:  And why not?

A:  . . . In my opinion the plain and ordinary meaning involves a physical connection.

(Waldrop Decl., Ex. 4 at 95:23-96:6.)  MV3's counsel objected that this was a construction expressly rejected by the Court which did not follow the claim construction allowing for "hardware and software."  (*Id*. at 96:10-97:8.)  There was an extended colloquy regarding the term; the Court apparently misapprehended that MV3's counsel was objecting that a physical connection was not hardware, when MV3 was actually objecting to the exclusion of "hardware and software" (*i.e.*, the possibility of a wireless rather than solely a physical connection).  (*Id*. at 96:8-100:11.)  The Court initially acknowledged that "docking port" could be either hardware or hardware and software, but it then appears that the Court may have confused the issue when it instructed Roku's counsel "you need to make clear to the jury that by physical connector, he cannot be using physical connector in a manner that is more restrictive or more narrow than the word 'hardware' is."  (*Id*. at 99:8-20.)  Dr. Russ then testified:

Q:  Dr. Russ, is a physical connection hardware?

A:  Yes.

Q:  And does your construction involve hardware?

A:  Yes.

Q:  Okay.  Thank you.  Now, turning to Slide 2.29, does that illustrate your conclusion as to why the Roku products do not include a docking port?

A:  Yes.  Roku uses a wireless interface, which I believe does not meet the plain and ordinary meaning of docking port.

Q:  Why not?

A:  Because, you know, from all the examples that I've shown before, a docking port – the plain and ordinary meaning of docking port, in my opinion, involves that physical connection.

(Waldrop Decl., Ex. 4 at 99:22-100:11; *see also id.* at 18:15-19:20; 78:2-17; 79:4-18; 85:1-85:24 (overruling objection regarding requirement that a docking port have a docking station); 87:14-88:17 (overruling objection); 88:21-89:7; 90:11-91:23 (overruling objection); 101:7-102:6.) During cross-examination, Dr. Russ confirmed that he was using a plain and ordinary meaning of "docking port" that had been rejected by the Court, testifying:

> Q: So you're not here to tell the jury that docking port requires that a connection, a physical connection, between the mobile computing device and the mobile set top box?
>
> A: Well, I am here to say that because I believe that is the plain and ordinary understanding of docking port.[1]

(Waldrop Decl., Ex. 4 at 198:8-12.)  (Waldrop Decl., Ex. 5 at 33:21-35:5.)  Exacerbating this misconduct, Roku further prejudiced MV3 during its closing argument by asserting:

> During his testimony, Dr. Russ explained that he used the Court's claim construction and applied the claim construction to the Roku products to decide that those products are different.  **Now, counsel for MV3 raised questions about Dr. Russ' claim construction application.  And we know why that's the case.  *As he did it, he was obviously permitted to do it, the Court didn't stop him*.  If he wasn't doing something correctly, counsel for MV3 would have objected, the Court would have stopped him.**

(Waldrop Decl., Ex. 5 at 30:11-20; *see also id.* at 33:21-35:5 (emphasis added).)

It was error to allow Dr. Russ to testify in violation of the Court's Orders, and it was error to allow Roku to argue to the jury that its violations were proper.  These substantial errors warrant a new trial.[2]

---

[1]  By contrast, Dr. Schonfeld testified that "docking port" had the meaning agreed to by the parties in the CCO, that a physical connection was not required, and that the patent allowed for both wired and wireless connections.  (Waldrop Decl., Ex. 6 at 109:7-113:1; Waldrop Decl., Ex. 7 at 223:14-224:12.)

[2]  Notwithstanding the Court's sustaining of MV3's objections to similar attempts to adduce testimony from Roku's fact witness, Gregory Garner, that a docking port required a physical interface (Waldrop Decl., Ex. 8 at 140:18-141:20), Mr. Garner's technical testimony frequently

> b) The Court Did Not Include The Agreed Construction Of Docking
> Port In Its Jury Charge And Its Subsequent Reading Of The Claim
> Construction Order To The Jury Did Not Cure The Error.

The Court did not give the parties an opportunity to review the final version of the Jury Charge before it was read to the jury. The parties' agreed construction of the term "docking port" was omitted from the jury charge as given. (Waldrop Decl., Ex. 7 at 284:24-289:24.) After MV3 raised the issue, the Court acknowledged that it "is a major point." (*Id*. at 284:24-285:12.) MV3's counsel sought to provide the jury with a revised version of the jury charge to ensure that the proper construction was brought to the jury's attention, but the Court declined to do so. (*Id*. at 289:8-24.) Roku's counsel convinced the Court that it should instead simply read the CCO the following morning because it did not want the omission highlighted to the jury. (*Id*. at 287:20-288:3.) Roku's reluctance to have the jury clearly understand the actual construction of "docking port" is unsurprising. Throughout the trial it advanced argument and testimony that a physical connector is required despite the agreed meaning of the term that docking could be accomplished through a wireless connection. It was prejudicial error for the Court not to make the jury aware of the proper claim construction of the term, separate and apart from its failure to prevent Roku from arguing and eliciting testimony in support of this rejected claim construction.

---

strayed into the purview of an expert witness and during trial MV3 filed a motion to preclude reliance on his technical testimony. (Dkt. 358.) The Court did not rule on that motion.

Moreover, because Roku knew that its expert had argued a claim construction contrary to the CCO, it requested that "the Court revise its claim construction of docking port from ordinary meaning to a physical connector that is used to connect a portable device or other circuitry, such as a charger;" the Court overruled that proposal. (Waldrop Decl., Ex. 7 at 99:19-25.) Thus, the Court was inconsistent in its handling of whether a "docking port" requires a physical connector.

   2.   **Roku Misled The Jury By Restricting The Construction of "Television Signal" And Insisting A Mobile Set Top Box Required A TV Tuner Despite The Fact The Court Rejected This Proposed Construction.**

Roku also circumvented the Court's CCO on "television signal" by impermissibly cloaking its rejected construction as the plain and ordinary meaning.  In its claim construction briefing, Roku's proposed construction of the term was "audio, video, and optionally, data signals for broadcast over the air, by satellite, and by cable over a range of frequencies." (Dkt. 72 at 2.)  Roku also asserted that a tuner was required to decode broadcast television signals; because Roku Players do not have a TV tuner, Roku sought this more restrictive definition of "television signal" to bolster its non-infringement positions.   The Court correctly rejected Roku's restrictive construction of the term.  (Dkt. 90 at 6.)

Despite the Court's rejection of Roku's more restrictive construction excluding signals used to convey television content through Internet networks (wired and wireless), Roku's counsel and its expert consistently flouted the CCO by insisting that its rejected construction was the plain and ordinary meaning.  For example, during its opening statement, Roku's counsel asserted that "television signals [] are distributed through cable TV services, satellite TV services or even over-the-air and onto an antenna," and argued that Roku devices do not receive television signals, rather "[t]hey simply receive a WiFi signal from a WiFi router that's connected to the Internet.  They don't have a TV tuner.  They cannot receive a TV signal." (Waldrop Decl., Ex. 3 at 70:12-17, 81:21-82:3.)  Roku's expert, Dr. Russ, similarly flouted the CCO, using Roku's rejected claim construction to opine "Television signals deliver content by broadcasting.  And, you know, they can be over the air, they can be cable, they can be satellite," and Roku players "cannot receive a television signal, and they lack a TV tuner for receiving and processing TV signals."[3]  (Waldrop

---

[3]  After Roku disclosed its proposed slides for Dr. Russ's direct examination (Dkt. 241 at 36-37), MV3 notified the Court of its objections to many of the slides because they "clearly are going to

Decl., Ex. 4 at 138:20-22, 137:10-12; *see also id.* at 139:8-14; 140:24-141:6; 142:2-8; 145:18-24.) This was in contrast to MV3's expert, Dr. Schonfeld, who testified that "[i]f you're watching television using any signal, you're watching a television signal." (Waldrop Decl., Ex. 7 at 231:22-23; *see also* 230:6-232:2.)

### 3.   Roku Impermissibly Imported A Requirement To Receive A Television Signal Through A TV Tuner Into "Mobile Set Top Box".

In its CCO, the Court correctly rejected Roku's overly narrow construction that the term "mobile set top box" means "a device that converts an input television signal to an output signal to a television set and also permits content from a mobile computing device to be displayed on the same television set to which the device is connected." (Dkt. 72 at 16.)   Instead, the Court "determine[d] that the proper construction for 'mobile set top box' is MV3's construction which recites 'a device that combines the functionality of a set top box and a mobile communication system." (Dkt. 90 at 10.)   Notwithstanding this construction, Roku consistently argued its rejected construction to the jury.   Dr. Russ testified:

---

go against the Court's claim construction.   And we request very humbly the ability to address those in the most vigorous, relentless way possible, Your Honor, in preservation of our rights. . . . there are just a number of slides that they're going to present today that go directly against the Court's claim construction order . . . numerous objections to [] almost all of them . . . [it] is an attempt to relitigate the case.   And if that is where we are, then, Your Honor, we're in for a very long day and a situation in which justice may not be achieved." (Waldrop Decl., Ex. 4 at 5:1-15.)   The Court subsequently stated: "So next with respect to the slides, we've looked over the slides. **At a minimum, they are problematic**.   Many of them, I think, look like they are from a Markman hearing rather than for trial." (*Id*. at 7:21-24 (emphasis added).)   However, rather than address the improper slides outside the presence of the jury, the Court required MV3 to object to each slide. (*Id*. at 8:7-25.)   This put MV3's counsel in the position of having to constantly object, making MV3 appear to the jury as if it was disruptive and as if it was trying to hide something.   After going through a litany of objections to the slides – with some sustained and some overruled – MV3's counsel informed the Court that it had "had a number of objections," that it had "preserved our record, but we're going to try to deal with this on cross to keep things moving. . . . I just wanted to make sure so the Court wasn't, you know, so focused on waiting for me to object, you know, for the umpteenth time, Your Honor." (*Id*. at 126:25-127:9.)

> Q:  And in the 2008 time frame, does your set top box understanding have anything to do with the TV signal testimony that you provided earlier?
>
> A:   In my opinion set top boxes have a broadcast television input.

(Waldrop Decl., Ex. 4 at 144:20-24; *see also* 145:10-11 ("So this language makes clear that the base functionality of a set top box is receiving a broadcast television signal.").)  Although Dr. Russ was asserting the rejected construction as the plain and ordinary meaning of "set top box," he told the jury Roku players could not be considered mobile set top boxes "[u]nder the Court's construction . . . [because] I believe that set top boxes receive broadcast television signals . . . And under the Court's construction if it's not a set top box, it's not a mobile set top box.  That's just the way the Court's construction works."  (*Id*. at 145:18-146:2.)  Dr. Russ also tied the lack of a tuner in Roku Players to his argument that they could not be set top boxes, testifying that a tuner was necessary to receive a television signal (under his rejected construction of the term), and that because they lacked a tuner they could not receive a television signal and therefore could not infringe.  (*Id*. at 142:2-143:11.)  This violated the Court's Order on MV3 MIL 4(vii).[4]  (Dkt. 332 at 5.)

## B.    Roku's Non-Practicing Entity Insinuations Were Prejudicial And The Curative Instruction Was Insufficient.

MV3 filed a MIL specifically to prevent Roku from referencing the fact that MV3 is a non-practicing entity ("NPE").  The Court granted the motion, stating:  "Roku is precluded from raising this topic during *voir dire* and opening arguments.  If Roku seeks to put on evidence about this topic at trial, Roku needs to notify the Court in advance for the Court's ruling on the topic."  (Dkt. 332 at 2.)  Defying this Order, Roku during its opening statement told the jury that MV3 was a NPE,

---

[4] In contrast to Dr. Russ, MV3's expert, Dr. Schonfeld, showed that he followed the Court's construction of "mobile set top box" and testified that Dr. Russ's construction violated the CCO.  (Waldrop Decl., Ex. 6 at 106:23-109:6; Waldrop Decl., Ex. 7 at 232:3-233:10.)

discussing the fact that MV3 has never made a product or a prototype.[5]  (Waldrop Decl., Ex. 3 at 77:16-23.)

Roku also blatantly violated the Court's Order regarding NPEs by asking MV3's witness, Wayne Barr, without notifying the Court in advance as directed by the Court, a series of questions designed to show to the jury that MV3 is an NPE.  (Waldrop Decl., Ex. 3 at 110:17-113:4.)  The Court itself called out Roku for its improper conduct, stating that although it did not use the term non-practicing entity, it had alluded to MV3's status as such, stating:  "the jurors know what a non-practicing entity is, every question you had was designed to indicate that this is a non-practicing entity."  (*Id.* at 124:11-20.)  The Court went on to state:  "the problem with – is that going after a non-practicing entity, if the motion in limine says you can't say they're a non-practicing entity, but the questions you ask are only relevant to proving that they are a non-practicing entity, then you're doing the same thing."  (*Id.* at 127:23-128:2.)  The Court granted MV3's request for a curative jury instruction on the issue (*Id.* at 130:21-131:3), but it became clear after the verdict that the curative instruction was insufficient.  During discussions with five of the seven members of the jury who agreed to meet with the Court and counsel after the verdict, multiple members of the jury stated that the fact MV3 was an NPE influenced their decisions, with at least two of them expressing a strong bias against MV3 over that fact.  (Waldrop Decl. at ¶ 3.)  Thus, MV3 was demonstrably and substantially prejudiced by Roku's violation of the Court's Order granting MV3's MIL 1(i).

---

[5] MV3 did not object during Roku's opening statement in view of the Court's admonishment that it would disfavor objections during opening and closing arguments.  (Waldrop Decl., Ex. 9 at 28:16-19.)

C.     **Roku's Damages Expert Relied Upon Two Roku License Agreements In Her *Georgia-Pacific* Analysis Although She And Dr. Bovik Testified They Were Not Technologically Comparable.**

Although the jury did not reach the issue of damages, MV3 was prejudiced by the Court permitting Roku's damages expert, Lauren Kindler, to testify regarding two supposedly "relevant" Roku licenses:  the Sockeye and Ittiam licenses.  (Waldrop Decl., Ex. 7 at 149:9-151:14, 184:2-187:5, 188:2-11.)  This testimony was prejudicial to MV3 because it suggested to the jury that MV3—which Roku had already improperly tainted as a non-practicing entity—was seeking "out of whack" damages when Roku had paid others dramatically less ($30,000 and $150,000) for supposedly "related" technologies.  (*Id*. at 151:1-14.)

Ms. Kindler testified regarding these two licenses (one of which was not even a patent license as required, and the other appeared to be a nuisance settlement for $30,000 three weeks after a complaint was filed) as considerations for the hypothetical negotiation and with relation to *Georgia-Pacific* factor 2, which addresses "[t]he rates paid by the licensee for **the use of other patents comparable** to the patent in suit."  (*Id.* at 128:6-22; *see also* 151:1-14, 189:11-191:2; *Georgia-Pacific Corp. v. U.S. Plywood Corp*., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (emphasis added).)

But both Ms. Kindler and Dr. Bovik, upon whom she relied for his analysis of the licenses, testified that they never conducted a technological comparison of the subject matter of the Sockeye and Ittiam licenses to either the '223 Patent's claims or the Accused Features.[6]  (*Id.* at 183:24-

---

[6] The Court granted MV3's MIL 2(ii) regarding licenses for which no expert has provided a comparability opinion "as it pertains to *voir dire* and opening arguments," but carried over to trial the use of evidence pertaining to these topics.  (Dkt. 332 at 3.)  The Court never ruled on the issue. During trial, MV3 filed a Motion to Exclude the Testimony of Dr. Alan C. Bovik and Preclude Reliance on His Testimony and Opinions with respect to these licenses before Ms. Kindler's direct examination.  (Dkt. 363; the "License Motion.")  The Court did not rule on MV3's License Motion, which is incorporated herein by reference.

187:10.)  MV3's counsel repeatedly objected to the Court allowing Dr. Bovik to testify regarding

the two licenses because his expert report showed that he had not conducted a comparability analysis,

but the Court allowed Dr. Bovik to testify.  (Waldrop Decl., Ex. 4 at 39:13-24, 40:9-17, 42:3-43:1.)

Dr. Bovik testified:

> Q.  Dr. Bovik**, have you offered any opinions** as to the Sockeye license or the
> Ittiam license **regarding technological comparability**?
>
> A.  To the '223 patent?
>
> Q.  Yes.
>
> A.  Okay.  I haven't tried to do some kind of, you know, element-by-element
> matching to the claims of the '223 and the Sockeye license, **no**.
>
> Q.  **Have you opined on the technological comparability** of the Ittiam and
> Sockeye licenses as to the accused features, screen mirroring and screen casting,
> in this case?
>
> A.  **No**.  It wasn't necessary for my task here.

(Waldrop Decl., Ex. 4 at 56:19-57:5) (emphasis added.)  Although Dr. Bovik had not done the

technological comparison necessary to meet the criteria for *Georgia-Pacific* factor 2, and MV3 filed

a motion to preclude Ms. Kindler from relying on Dr. Bovik's unreliable opinion, the Court allowed

Ms. Kindler to opine to the jury that MV3's expert's "lowest damages opinion" was "277x – 1383x

Greater" than the amounts Roku paid in the Sockeye and Ittiam licenses – "Roku's Relevant

Licenses."  (Waldrop Decl., Ex. 10.)  This constituted prejudicial error.[7]

---

Tellingly, Dr. Bovik testified at trial that the Ittiam license is a "patent license agreement that [he]
reviewed," but it was actually a software license and does not pertain to a patent.  (Waldrop Decl.,
Ex. 4 at 39:6-11; Ex. 7 at 184:2-23.)  It is apparent that Dr. Bovik's analysis and testimony
regarding the licenses were cursory and conclusory at best.

[7] Roku introduced additional prejudicial error into the record.  For example,

- Multicast:  In violation of the Court's Order granting MIL 4(ii), Roku introduced an
  undisclosed argument regarding the way in which Roku Players and Roku TVs receive
  unicast (but purportedly not multicast) packets.  (Waldrop Decl., Ex. 4 at 129:8-136:11.)
  Roku also flouted the Court's CCO and *Daubert* Order by stating that Roku Players and
  TVs cannot process multicast signals and inferring the single sender to multiple recipient
  claim construction issue; Roku redefined multicast to mean something different from what
  the Court addressed and used plain and ordinary meaning to justify it.  (*Id*. at 131:9-15.)

## III.    ARGUMENT

### A.    Legal Standard.

Whether to grant a motion for a new trial under Rule 59(a) is a procedural issue not unique

to patent law and is guided by the law of the Circuit in which the District Court sits.  *Versata Software*

*Inc. v. SAP Am., Inc.*, No. 2:07-CV-153 CE, 2011 U.S. Dist. LEXIS 102339, at *12-13 (E.D. Tex.

Sept. 9, 2011) (*citing Riverwood Intern. Court v. R.A. Jones & Co., Inc.*, 324 F.3d 1346, 1352 (Fed.

Cir. 2003)).  A motion for new trial "may invoke the discretion of the court in so far as it is bottomed

---

The Court gave the term "multicast broadcasts" its plain and ordinary meaning, but noted that "Roku's proposed construction incorrectly limits the number of senders to a single sender.  More specifically, the term 'multicast' only describes that there is more than one recipient and not necessarily that there is also only a single sender."  (Dkt. 90 at 14-15; *see also* Dkt. 332 at 7 ("The Court ruled that Dr. Russ cannot opine that a multicast broadcast is limited to a single sender.")  To deepen the prejudice to MV3, after the Court read the Jury Charge to the jury that omitted the agreed construction of "docking port," the Court declined to clarify the "Multicast" term to the jury.  (Waldrop Decl., Ex. 7 at 293:24-294:4.)

- Financial interests:  The Court granted MV3's MIL 1(iv) precluding Roku from (1) raising how or to whom a damages award to MV3 may be distributed or the members' ownership interests during *voir dire* and opening statements and (2) requiring Roku to notify the Court in advance before putting on evidence about the topic at trial.  (Dkt. 332 at 2.)  Roku's counsel nevertheless questioned MV3's first witness, Wayne Barr, about MV3's status as an NPE, his ownership interest in MV3, and how damages would be distributed to him – all without raising the issue with the Court first.  (Waldrop Decl., Ex. 3 at 118:12-119:16.)  After that testimony, the Court noted (when discussing Roku's violation of MIL 1(i) regarding NPEs) that "I understand when a lawyer is asking the questions, it's very difficult – that's why we have motions *in limine*."  (*Id*. at 129:10-12) (emphasis added.)  It was prejudicial error to allow Roku to question Mr. Barr regarding his ownership interest and how damages may be distributed.

- Prior use and practicing prior art:  During Roku's opening statement, the Court noted that it had "opened the door" regarding prior use by discussing "products they had and the technology they were doing, anything that might intimate they had this knowledge about what was in the patent ahead of the patent."  (Waldrop Decl., Ex. 3 at 123:17-124:10.)  Roku's behavior had been precluded by the Order granting MV3's MIL 4(i).  (Dkt. 332 at 4.)  The Court nevertheless refused MV3's request for a curative instruction to inform the jury that the law does not permit an alleged patent infringer to defend itself against a charge of infringement by asserting they practiced the asserted patent prior to its issuance.  (Waldrop Decl., Ex. 7 at 176:11-14 (mistakenly referring to MV3's request for curative instructions as Roku's request); *see also* 35 U.S.C. § 282.)  This constituted harmful error.

on the claim that . . . the trial was not fair to the party moving; and may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." *Montgomery Ward*, 311 U.S. at 251; *see also Smith*, 773 F.2d at 612–13 ("Rule 59 of the Federal Rules of Civil Procedure confirms the trial court's historic power to grant a new trial based on its appraisal of the fairness of the trial and the reliability of the jury's verdict. . . . A new trial may be granted, for example, if . . . the trial was unfair, or prejudicial error was committed in its course.")

And, as the Fifth Circuit recently recognized, "[a] court may grant a new trial when there is an erroneous evidentiary ruling at trial." *Jordan v. Maxfield & Oberton Holdings, L.L.C.*, No. 19-60364, 2020 U.S. App. LEXIS 31893, at *8 (5th Cir. Oct. 7, 2020) (*citing Willitt v. Purvis*, 276 F.2d 129, 132 (5th Cir. 1960) (affirming the district court's grant of a new trial when evidence was erroneously adduced at the trial).

Here, Roku's conduct resulted in the erroneous introduction of evidence and argument at trial, and because of its repeated and relentless misconduct the jury was prejudiced, the trial was not fair to MV3, and justice was not done.

**B.      A New Trial Should Be Granted Because The Jury Was Improperly Required To Resolve Claim Construction Disputes.**

Only once a patent has been construed by the Court as a matter of law, can a jury properly determine whether there is infringement. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury, must resolve that dispute.")  Roku repeatedly and intentionally flouted the Court's constructions, and a new trial is necessary.

**1.      Roku's Repeated Violations Of The Court's Orders Were Prejudicial.**

Roku repeatedly reverted to claim constructions which the Court had rejected and it brazenly (and falsely) asserted that these rejected constructions were the plain and ordinary meaning of the

terms.  As the Court noted during the hearing on MV3's *Daubert* motion on the term "adaptive circuitry," using a rejected construction is improper.  (Waldrop Decl., Ex. 1 at 74:3-76:17).  And that the Court granted MV3's MIL 4(vii) excluding testimony or arguments contrary to or unsupported by the Court's Claim Construction Order further highlights the gross impropriety of Roku's conduct. (Dkt. 332 at 5.)  Yet, Roku shamelessly flouted the Court's CCO and MIL Order.  For MV3, which acted in reliance upon and obeyed this Court's orders, the result was injustice.

A flagrant example of Roku's behavior was argument by Roku's counsel and testimony by Dr. Russ that the term "docking port" required a physical connection.  During the *Markman* hearing the Court stated:  "and so the defendant understands, I was uncomfortable in terms of your construction reading docking port to require it to be a physical interface into or on which another component may be placed.  I thought that went too far."  (Waldrop Decl., Ex. 2 at 57:4-12.) Nevertheless, Dr. Russ opined that the plain and ordinary meaning of "docking port" required a physical connection, despite the agreed meaning that the term could be "*either* (1) hardware *or* (2) hardware and software" (and thus could include a wireless connection).  (Dkt. 90 at 6 & fns. 1-2; *see supra* at 4-6.)  The Court further clouded this situation by misapprehending MV3's objection and allowing Roku to reinforce its argument that a physical connection was required.  (*See supra* at 5-6.)  Roku capitalized on the error, and compounded the prejudice to MV3, by incorrectly arguing during closing arguments that because the Court had allowed Dr. Russ to testify regarding his claim construction applications, that those claim constructions must have been correct.  (*See supra* at 6.)

"When determining whether a new trial should be granted based on violation of court orders, the trial court is given great deference to 'gauge the prejudicial impact' of a party's or their counsel's improper conduct during the trial.  A new trial is warranted on the ground of misconduct during the trial where the misconduct establishes the belief that the jury was influenced by 'prejudice in

reaching its verdict.'" *Amway Corp.*, 2013 U.S. Dist. LEXIS 75393, at *7-10 (*quoting All Freight Systems*, 115 F. App'x at 187.)  Further, it was prejudicial to make MV3 continually object to Roku's repeated violations of the Court's Orders, thereby leading the jury to believe that MV3 was being disruptive and or trying to hide something.  A New Jersey district court faced a similar situation during a patent infringement trial in which a party's misconduct put the opposing party in an untenable position. *See Waddington*, 2011 WL 3444150.  The *Waddington* Court stated:

> In instances where misconduct is constant and repeated, **counsel cannot object to every transgression** – there are simply too many transgressions. Indeed, such constant misconduct puts opposing counsel in lose-lose situation **requiring counsel to either object and be seen as combative, or allow the misconduct to continue**. *See Straub v. Reading Co*., 220 F.2d 177, 181 (3d Cir. 1955).

> In this case, as mapped below, Mr. Sutton's misconduct was so constant and repeated that if WNA had objected to every issue, the stream of objections would have ground the proceeding to a halt, and given the jury the impression that counsel for WNA was angry, combative, and attempting to keep relevant evidence from it. **Thus, counsel for WNA can hardly be faulted for failing to object to the thirtieth transgression of the day at trial.** Indeed, the Court notes that WNA likely erred on the side of objecting frequently, so frequently that its proper objections **likely prejudiced its position with the jury**.

*Id*. at *5 (emphasis added).  The transgressing party's actions included repeated violations of orders on motions *in limine*, as well as other misconduct that warranted repeated objections.   The *Waddington* Court granted a new trial and held that the defendant and its witnesses "shall not repeat the litany of improper conduct."  *Id*. at *24.  A patent owner, or indeed any party, needs to be able to rely upon the enforcement of court orders to ensure a level playing field.  Roku's repeated and consistent violation of the Court's Orders caused exactly the type of prejudice which demands a new trial.

## 2. It Was Prejudicial Error To Allow The Jury, Rather Than The Court, To Construe Disputed Terms.

In addition to Roku's violations of the Court's Orders, prejudicial error arose because when the Court gave the plain and ordinary meaning as the definition of certain claim terms regarding

which the parties had fundamental disputes (including "television signal," "docking port," and

"multicast"), the jury was left to resolve the disputes between the parties by construing these terms.[8]

In *O2 Micro* the Federal Circuit held "[w]hen the parties raise an actual dispute regarding

the proper scope of [] claims, the court, *not the jury*, must resolve that dispute. *O2 Micro*, 521 F.3d

at 1360 (emphasis added.)  The *O2 Micro* Court further held that:

> [The] dispute over the scope of the asserted claims is a question of law.  In deciding
> that [the disputed term] needs no construction because the term has a 'well-
> understood definition,' the district court failed to resolve the parties' dispute because
> the parties disputed not the meaning of the words themselves, but the scope that
> should be encompassed by this claim language.  A determination that a claim term
> "needs no construction" or has the "plain and ordinary meaning" may be inadequate
> when a term has more than one "ordinary" meaning or when reliance on a term's
> "ordinary" meaning does not resolve the parties' dispute.

*Id*. at 1361.  The Court further elaborated that:

> When the district court failed to adjudicate the parties' dispute regarding the proper
> scope of [the disputed term] the parties presented their arguments to the jury.  By
> failing to construe this term, the district court left the jury free to consider these
> arguments. …
>
> When the parties present a fundamental dispute regarding the scope of a claim term,
> it is the court's duty to resolve it.

*Id*. at 1362.  The Federal Circuit further instructed that "[i]t is improper to argue claim construction

to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'"

*Kinetic Concepts, Inc. v. Blue Sky Med. Group, Inc*., 554 F.3d 1010, 1027 (Fed. Cir. 2009) (*quoting*

*CytoLogix Corp. v. Ventana Med. Sys., Inc*., 424 F.3d 1168, 1172-73 (Fed. Cir. 2005)); *see also*

*Howmedica Osteonics Corp. v. Zimmer, Inc*., 822 F.3d 1312, 1321 (Fed. Cir. 2016) ("[F]ocusing on

---

[8] As discussed *supra* at page 4 and footnote 7, the parties agreed that the term "docking port"
should be considered either "hardware or hardware and software" and the Court provided
"guidance" regarding "multicast," but both terms were initially left out of the jury charge and the
significance of the omission regarding "docking port" was not highlighted and no curative
instruction was given regarding "multicast."  In addition, Roku continued to give each of these
terms constructions that had been rejected by the Court.

a particular term's plain and ordinary meaning may be inadequate, when relying on that meaning does not resolve the parties' dispute."). As shown by the parties' diametrically opposed positions regarding terms that the Court gave their plain and ordinary meaning, it was prejudicial error not to have construed those terms – thereby leaving legal questions to be answered by the jury – just as it was error to allow Roku to ascribe plain and ordinary meaning to its proposed constructions that the Court previously had rejected. Such error warrants a new trial. *O2 Micro*, 521 F.3d at 1362-1363 (Where the District Court had not resolved the disputed term and instead construed it to have a plain and ordinary meaning so that the jury was left to decide a legal issue, the Federal Circuit remanded for further proceedings.)

### C.   A New Trial Should Be Granted Because There Were Prejudicial Errors In The Jury Instructions And The Introduction Of Evidence.

As the Fifth Circuit has held, "a new trial is the 'appropriate remedy for prejudicial errors in jury instructions.'" *Hartsell v. Dr. Pepper Bottling Co.*, 207 F.3d 269, 275 (5th Cir. 2000) (*quoting Aero International, Inc. v. United States Fire Ins. Co.*, 713 F.2d 1106, 1113 (5th Cir. 1983). A party is "entitled to have the critical issues . . . 'submitted to and answered by the jury upon a clear and proper charge.'" *Aero International*, 713 F.2d at 1113 (*quoting NMS Industries, Inc. v. Premium Corp. of America, Inc.*, 451 F.2d 542, 545 (5th Cir. 1971). As discussed *supra* at 7, 10-11 and footnote 7, there were multiple errors in the jury instructions given to the jury, including (1) the fact that the agreed construction of the term "docking port" was omitted from the instructions and then confusingly buried in a separate reading of the CCO the next day, (2) the "guidance" on the term "multicast" was not included, (3) no curative instruction regarding prior use was given, and (4) the curative instruction regarding NPEs was clearly insufficient as reflected by multiple members of the jury stating that MV3's status as an NPE influenced their decisions. (*See supra* at 11; Waldrop Decl.

at ¶ 3.)  MV3 was substantially prejudiced by Roku's violation of the Court's Order granting MV3's MIL 1(i) that it should not discuss MV3's status as an NPE.

Moreover, Roku improperly capitalized on the Court's evidentiary ruling on the Sockeye and Ittiam licenses (and its failure to rule on MV3's MIL 2(ii) and License Motion) by having its damages expert opine regarding those licenses and their relative amounts in comparison to the damages sought by MV3.  Even worse, both Dr. Bovik and Ms. Kindler admitted that these licenses were in no way comparable to the claims of the '223 Patent or the accused technology, and that they had not even conducted a technological comparability analysis.  *See Jordan*, 2020 U.S. App. LEXIS 31893, at *8 (*citing Willitt*, 276 F.2d at 132 (affirming the district court's grant of a new trial when evidence was erroneously adduced at trial).  While the jury did not reach the issue of damages, the inference that MV3 was a grasping NPE seeking unreasonable damages amounts was prejudicial in influencing the jurors.  This is a case where "it is reasonably clear that prejudicial error has crept into the record [and] that substantial justice has not been done."  *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999).  A new trial is necessary here.

## IV.   CONCLUSION

For the foregoing reasons, MV3 respectfully requests that the Court order a new trial on both infringement and damages pursuant to Rule 59 of the Federal Rules of Civil Procedure.

Dated:  October 26, 2020

RESPECTFULLY SUBMITTED,

By: */s/ Andy Tindel*
J. Mark Mann (Texas Bar No. 12926150)
mark@themannfirm.com
G. Blake Thompson (Texas Bar No. 24042033)
blake@themannfirm.com
**MANN | TINDEL | THOMPSON**
300 W. Main Street
Henderson, Texas 75652
913 Franklin Ave., Suite 201
Waco, Texas 76701
Telephone:  (903) 657-8540
Facsimile: (903) 657-6003

Andy Tindel (Texas Bar No. 20054500)
atindel@andytindel.com
**MANN | TINDEL | THOMPSON**
112 E. Line Street, Suite 304
Tyler, Texas 75702
Telephone: (903) 596-0900
Facsimile: (903) 596-0909

Craig D. Cherry (Texas Bar No. 24012419)
ccherry@haleyolson.com
**HALEY & OLSON, P.C.**
100 N. Ritchie Road, Suite 200
Waco, Texas 76712
Telephone: (254) 776-3336
Facsimile: (254) 776-6823

Jonathan K. Waldrop (CA Bar No. 297903)
(Admitted in this District)
jwaldrop@kasowitz.com
Darcy L. Jones (CA Bar No. 309474)
(Admitted in this District)
djones@kasowitz.com
Marcus A. Barber (CA Bar No. 307361)
(Admitted in this District)
mbarber@kasowitz.com
John W. Downing (CA Bar No. 252850)
(Admitted in this District)
jdowning@kasowitz.com
Heather S. Kim (CA Bar No. 277686)
(Admitted in this District)
hkim@kasowitz.com
Jack Shaw (CA Bar No. 309382)
(Admitted in this District)
jshaw@kasowitz.com

ThucMinh Nguyen (CA Bar No. 304382)
(Admitted *pro hac vi*ce)

tnguyen@kasowitz.com
**KASOWITZ BENSON TORRES LLP**
333 Twin Dolphin Drive, Suite 200
Redwood Shores, California 94065
Telephone: (650) 453-5170
Facsimile: (650) 453-5171

Paul G. Williams (GA Bar No. 764925)
(Admitted *pro hac vice*)
pwilliams@kasowitz.com
**KASOWITZ BENSON TORRES LLP**
1230 Peachtree Street N.E., Suite 2445
Atlanta, Georgia 30309
Telephone: (404) 260-6080
Facsimile: (404) 260-6081

**Attorneys for Plaintiff**
**MV3 PARTNERS LLC**

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served or delivered electronically

via U.S. District Court [LIVE] — Document Filing System, to all counsel of record, on this 26th

day of October, 2020.

*/s/ Andy Tindel*
**Andy Tindel**